## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ANTON K. RAPPOLD, individually and on behalf of all others similarly situated,

ECF CASE

Plaintiff,

Civil Action No: 07 CV 10396

v.

CITIGROUP INC., CITIBANK, N.A., CHARLES PRINCE, THE PLANS ADMINISTRATION COMMITTEE OF CITIGROUP INC., THE 401(k) INVESTMENT COMMITTEE, and JOHN and JANE DOES 1 - 10,

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

JURY TRIAL DEMANDED

Defendants.

Plaintiff Anton K. Rappold, on behalf of himself and all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public statements and announcements, United States Securities and Exchange Commission ("SEC") filings, media reports and publicly available trading data of Citigroup Inc. ("Citigroup" or the "Company").

### NATURE OF THE ACTION

1.    Plaintiff brings this action under the Employee Retirement Income Security Act ("ERISA") §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for relief on behalf of the Citigroup 401(k) Plan, (the "Plan"), which Plan was and is operated and established by Citigroup as a benefit for its employees.

2.    Citigroup is the Plan Sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. §

1002(16)(B).

3.      Plaintiff brings this action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the Class defined below in paragraph 108.

4.      Defendants are entities and persons acting in a fiduciary capacity, or who assumed a fiduciary role in relation to the Plan. Plaintiff's claims arise from the failure of the Defendants to act in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets.

5.      Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in Citigroup common stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent due to the Company's mismanagement and improper business practices including: (a) participating in the formation and management of off-balance-sheet structured investment vehicles ("Conduits" or "SIVs") without disclosing Citigroup's contingent liabilities or risks related thereto; (b) causing the Conduits and/or SIVs to issue billions of dollars of commercial paper and short term loans based on false and misleading statements; (c) marketing and extending subprime loans made on a "low documentation" basis, without adequate consideration of the borrower's ability to pay and with unreasonably high risk of borrower default; (d) failing to adequately disclose to investors, including the Plan participants, Citigroup's potential subprime loan loss exposure; (e) operating without adequate internal controls and modeling to determine appropriate loan loss provisions; (f) understating loan loss provisions, which caused Citigroup's financial statements to be misleading and which artificially inflated the value of shares of Citigroup stock. During the Class Period, the Company was mismanaged and faced financial crisis due to such mismanagement, which rendered Company securities an imprudent

investment.

6.      As Citigroup's financial condition became known to the market, its stock price and its market value declined.

7.      Plaintiff and the Class owned Citigroup stock through the Plan and have suffered substantial losses. As of December 31, 2006, the Plan held $4.13 billion of Citigroup stock, which amounted to approximately 32% of the Plan's total assets. Defendants' breaches of fiduciary duties have caused the Plan to lose over $1 billion dollars.

8.      Plaintiff's claims arise from the failure of the Defendants to exercise the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" in administering the Plan's assets during the Class Period.

9.      Plaintiff alleges that Defendants breached their fiduciary duties to the participants of the Plan because they knew or should have known that the Company's securities were no longer a prudent investment; yet, they failed to take steps to eliminate or reduce the amount of Company stock in the Plan, and failed to give Plaintiff and the Class complete and accurate information about Citigroup's loan loss exposure so they could make informed investment choices under the Plan.

10.     As a result of the Defendants' breaches alleged herein, Plaintiff and the Class and/or the Plan suffered substantial losses.

11.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole and because ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the Plan, Plaintiff brings this action as a class action of behalf of all participants and beneficiaries of the Plan.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

13.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because one or more of the Defendants are located in this district, and all Defendants conduct business within this district. This case arises out of Defendants' acts within this district.

14.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because Defendants administer the Plan in this district, some or all of the actionable conduct for which relief is sought occurred in this district, and one or more of the Defendants may be found in this district.

## THE PARTIES

**Plaintiff**

15.    Plaintiff Anton K. Rappold is a resident of the State of Maryland. He is a participant or beneficiary of the Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a), and was a participant or beneficiary of the Plan during the Class Period. He continues to hold shares of Company stock in his retirement account in the Plan.

**Defendants**

16.    Defendant Citigroup is a corporation organized under the laws of the State of Delaware with its executive offices located at 70 Pine Street, New York, New York.

17.    Citigroup is the sponsor of the Plan within the meaning of ERISA, and itself exercised fiduciary duties and responsibilities. Citigroup exercised ultimate decision-making authority for the administration and management of the Plan and Plan's assets.

4

18.    Citigroup is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plan.

19.    Citibank, N.A. ("Citibank") is a commercial bank and wholly owned subsidiary of Citigroup. Citibank is a Delaware corporation having its principal place of business at 399 Park Avenue, New York, NY. Citibank is named in the Plan as the Plan Trustee and thus, is a named fiduciary under ERISA (29 U.S.C. § 1103(a)).

20.    Upon information and belief, the Citigroup Board of Directors ("Citigroup Board" or the "Board") has ultimate oversight over the Plan, and is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercises discretionary authority or discretionary control respecting management of the Plan, exercises authority or control respecting management or disposition of the Plan's assets, and/or exercises discretionary authority or discretionary responsibility in the administration of the Plan.

21.    Defendant Charles Prince ("Prince") was at all times relevant hereto Chairman of the Board and Chief Executive Officer of Citigroup, until resigning on November 4, 2007. Most of Prince's compensation package was tied to his performance at the Company. Upon information and belief, until his resignation, Prince had ultimate oversight of the Plan and was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Prince exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or exercised discretionary authority or

5

discretionary responsibility in the administration of the Plan.

22.    The Plans Administration Committee of Citigroup Inc. ("Administration Committee") is the Plan Administrator and, upon information and belief, was responsible for administering and managing the Plan on a day-to-day basis, and advising Citigroup, Citibank and the Citigroup Board regarding the Plan and Plan's assets.

23.    The members of the Administration Committee are fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority with respect to: (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

24.    Upon information and belief, the 401(k) Plan Investment Committee ("Investment Committee") was responsible for choosing the Plan's investments and monitoring the performance of those investments.  The Investment Committee members are fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority with respect to: (a) management and administration of the Plan; and/or (b) management and disposition of the Plan's assets.

25.    Defendants John and Jane Does 1-10 are additional fiduciaries of the Plan that are presently unknown to Plaintiff.

## THE PLAN

26.    Upon information and belief, the Plan is a defined contribution plan covering eligible employees of the Company.  It is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  The Plan is an "eligible individual account plan" within the meaning of ERISA  § 407(d)(3), 29 U.S.C. § 1107(d)(3), and is also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).  The Plan is not a party to this action.  Pursuant to ERISA the relief requested in this action is for the benefit of the Plan.

27.    Pursuant to Internal Revenue Code provisions, contributions to the Plan are limited. Participants directed employee and Company contributions to various investment options in the Plan. Most of these options were diversified mutual funds. However, the options also included the Citigroup Inc. Common Stock Fund.

28.    According to the Plan's Form 11-K Annual Report of the Plan, as of December 31, 2006, approximately $4.13 billion of the Plan's $12.92 billion of assets were invested in Citigroup common stock through the Citigroup Inc. Common Stock Fund.

## DEFENDANTS' FIDUCIARY STATUS

29.    Pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A), every plan must provide for one or more named fiduciaries. The person named as "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a definition, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

30.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions.

31.    ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) makes a person a fiduciary to the extent "he [or she] exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, appointing Plan administrators, overseeing the Plan administrators, and making statements to participants with respect to the Company, its financial results and business prospects.

7

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

32.    ERISA applies to employee benefit plans, including retirement savings plans, such as the Plan. The policy of ERISA is to protect the interests of Plan participants and their beneficiaries. ERISA § 2(b), 29 U.S.C. § 1001(b).

33.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. ERISA § 3(21(A), 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of a plan's management.

34.    ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1),(B), 29 U.S.C. § 1104(a)(1),(B).

35.    ERISA also imposes on fiduciaries, such as Defendants, a duty of loyalty, requiring them to "discharge [their] duties with respect to a plan solely in the interest of the participants and their beneficiaries and ... for the exclusive purpose of ... providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1),(A),(i), 29 U.S.C. § 1104(a)(1),(A),(i).

36.    Other duties imposed under ERISA upon fiduciaries, such as Defendants, include:

    a.    the duty to investigate and evaluate the merits of decisions affecting the use and disposition of plan assets;

8

b.  the duty to evaluate all investment decisions with "an eye single" to the interests of plan participants and beneficiaries;

c.  the duty to avoid placing themselves in a position where their acts as officers, directors, or employees of a company will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan, and, if they find themselves in such a position, to seek independent, unconflicted advice;

d.  the duty, under appropriate circumstances, to monitor or influence the management of the companies in which the plans own stock;

e.  to the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named;

f.  the duty to disclose and inform of any material adverse information about a company in which the plan is invested; and

g.  the duty to disclose comparative risks associated with investing in a particular investment.

37.  ERISA allows the fiduciary function to be shared among individuals and entities. Based on the information available to Plaintiff, the Defendants' fiduciary responsibilities were at least partially allocated among Citigroup, Citibank, Prince, the Administration Committee and the Investment Committee.

## FACTS RELATING TO THE SUBPRIME MORTGAGE MARKET

38.  The mortgage lending business has evolved since the 1970s with the development of national markets for mortgages, technological changes, and securitization. The mortgage market has

9

been the fastest growing securitization debt market, larger than the market for U.S. Treasury bonds and notes. Between 2001 and 2005, the subprime mortgage lending industry grew from $120 billion to $625 billion. Ruth Simon & James R. Hagerty, *More Borrowers With Risky Loans Are Falling Behind- Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, WALL ST. J., Dec. 5, 2006.

39.     "The term 'subprime' generally refers to borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios." *Subprime and Predatory Lending: New Regulatory Guidance, Current Market Conditions, and Effects on Regulated Financial Institutions: Hearing Before the Subcomm. On Financial Institutions and Consumer Credit of the H. Comm. on Financial Services*, 110th Cong. 220 n.1 (2007) (Statement of Sandra F. Braunstein, Director, Div. of Consumer and Cmty. Affairs, Federal Reserve Board).

40.     At the end of 2006, subprime loans represented approximately 13-14% of the 43 million first-lien mortgage loans outstanding in the United States.

41.     Many industry experts and regulators, including the Federal Deposit Insurance Corporation (the "FDIC"), have attributed the rapid growth in the subprime lending market to a confluence of factors that occurred in 2004 and 2005, including rising home prices, declining affordability, historically low interest rates, intense lender competition, innovations in the structuring and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors. *See Mortgage Market Turmoil: Causes and Consequences: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs,* 110th Cong. (2007) (statement of Sandra L. Thompson,

Director, Div. of Supervision and Consumer Prot., FDIC) [hereinafter *Mortgage Market Turmoil Hearing*], available at http://banking.senate.gov/_files/ACF45B6.pdf.

42.    In 2004, interest rates began to climb and the pool of potential prime borrowers looking to refinance began to shrink.  Lenders began extending loans to subprime borrowers in an effort to maintain or grow market share in a declining prime borrower market.

43.    To take advantage of this increasing subprime borrower market, lenders began relaxing their underwriting standards, including:

      (a)    reducing minimum credit scores,

      (b)    increasing loan to value ratios, and

      (c)    decreasing or eliminating borrowers' documentation of income and assets.

*See* Ruth Simon, *Mortgage Lenders Loosen Standards-Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* WALL ST. J., July 26, 2005, at D1.

44.    In addition to relaxing underwriting standards, lenders began offering loan products which increased the risk of default, including: (a) no-documentation and low-documentation loans; (b) piggy-back loans (combining a mortgage with a home equity loan and/or line of credit and thus avoiding the requirement of securing private mortgage insurance); (c) interest-only mortgages; and (d) option adjustable-mortgages.

45.    In May 2005, bank regulators issued their first guidelines for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well.  Testimony of Sandra L. Thompson, *supra*.  The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" indicated that bank regulators were concerned about the relaxed underwriting standards and general lax risk management practices of subprime lenders.

11

46.    In mid-2005, delinquency rates (60-days or more past due) for subprime loans rose for the first time since 2002. By the fourth quarter of 2005, delinquencies and foreclosures increased. As of October 2005, the delinquency rate was twice that recorded on new subprime loans when compared to a year earlier. *See* Simon & Hagerty, *More Borrowers, supra.*

47.    According to the FDIC, total subprime delinquencies rose from 10.33% in the fourth quarter of 2004 to 13.33% in the fourth quarter of 2006, and foreclosures rose from 1.47% to 2.0% over the same period. Testimony of Sandra L. Thompson, *supra.*

48.    Subprime mortgage loans with adjustable rates accounted for the largest increase in delinquency rates, an increase from 9.83% to 14.44% between the fourth quarter of 2004 and the fourth quarter of 2006. For the same period, foreclosures rose from 1.5% to 2.7%. *Id.*

49.    Upon information and belief, no later than January 2007, Citigroup became aware of a significant increase in the default of its subprime loans and the losses which the Company would have to recognize. Citigroup failed to timely disclose its subprime loan loss exposure.

50.    Conduits and SIVs are investment vehicles that banks use to issue commercial paper. They were, until recently, touted by their issuers as highly rated, short-term notes that offer investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

51.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate by which they borrow money and the rate by which they lend money.

52.    Because most conduits or SIVs are off the-balance-sheet entities, it is difficult for investors to evaluate the financial risks they pose.

53.     According to reports, Citigroup operates conduits and SIVs with assets totaling at least $160 billion. *See* David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, WALL ST. J., Oct. 17, 2007.

54.     In order to raise proceeds for its SIVs, Citigroup touted to money market fund managers and other investors that the conduits were safe investments which use the proceeds from the issuance of commercial paper and short term notes to invest strictly in high quality debt securities. *See Team Of The Month - Citigroup SIV Enters Uncharted Space - Citigroup Alternative Investments Last Month Launched A Pioneering Structured Investment Vehicle. It Boosts Leverage To The Subordinated Noteholder Without Really Increasing The R*, The Banker, Oct. 1, 2004; *Citigroup creates bespoke SIV for mystery ABS investor; Structured investment vehicle; asset backed securities; Citigroup Inc.*, Euroweek, Nov. 10, 2006.

55.     It has been reported that Citigroup may have to move its conduits onto its balance sheet and recognize billions of dollars in potential liability that the Company had not adequately disclosed to investors in Citigroup common stock, including Plan participants. *See* Peter Eavis, *Behind the Citigroup rescue*, Fortune, Oct. 15, 2007.

56.     Citigroup's conduits are on the brink of collapse, subjecting the Company to billions of dollars in liability as a result of investor lawsuits for causing the conduits to issue debt based on materially false and misleading statements. *Id.*

## CITIGROUP'S PUBLIC STATEMENTS

57.     On January 19, 2007, Citigroup announced its financial results for the year ended December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of $23.8 billion,

record full year 2006 revenues of $89.6 billion, and record full year 2006 income from continuing operations of $21.2 billion.

58.    In a press release issued by the Company on January 19, 2007, announcing its results, Prince stated "Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions."

59.    During a January 19, 2007 earnings call with investors discussing the Company's fourth quarter 2006 results, a UBS analyst questioned why loan loss reserves had not changed when there had been a pick up in Citigroup's consumer loans. Citigroup's Chief Financial Officer at the time, Sallie Krawcheck, stated that:

> We believe we have the right level of reserves, but we are seeing in terms of the growth in the portfolio, what we see in terms of the embedded losses in the portfolio, and as the loss – as the environment changes, as the complexion of the portfolio changes, et cetera, we review that. We have, I guess, to go along with the guys who have the pocket protectors, we have the PhD guys who look at the reserves, and we feel very good, very good about the level of them.

60.    On February 23, 2007, Citigroup filed its Form 10-K for the year ended December 31, 2006, with the SEC (the "2006 10-K"). The Company reported that it earned $21.2 billion from continuing operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from continuing operations increased 11%, with the increment in the growth rate reflecting the benefit from Citigroup's share repurchase program; net income, which includes discontinued operations, was $21.5 billion, a decrease of 12% from the prior year, reflecting the absence of significant gains on sales of businesses recorded in 2005.

61.    Commenting on its outlook for 2007, the Company stated in the 2006 10-K:

We enter 2007 with good business momentum, as we expect to see our investment initiatives generate increasing revenues, and are well-positioned to gain from our balanced approach to growth and competitive advantages.

We expect to continue to achieve growth in loans, deposits and other customer activity resulting from our increased distribution points, expanded product offerings, and the impact from recent targeted acquisitions.

In 2006, our international businesses contributed 43% of our income from continuing operations. We expect to continue to re-weight our revenue mix towards International Consumer, CIB and Global Wealth Management.

Disciplined capital allocation will remain fundamental to our strategic process and we will have a sharp focus on expense management.

Although there may be volatility in our results in any given year, over the long term our revenues are targeted to grow organically at a mid-to high-single-digit rate, with strong expense and credit management driving earnings and earnings per share growth at a faster level. We will seek to augment this growth rate over time through targeted acquisitions.

Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006.

62.    In commenting on its U.S. Consumer Lending divisions, the 2006 10-K stated that

"*Provisions for loan losses and for benefits and claims* increased primarily on higher credit losses in

the Real Estate Lending and Auto businesses, partially offset by higher loan loss reserve releases of

$63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning

in Real Estate, as well as volume growth in Autos." *Id.* at 27.

63.    Citigroup did not disclose any problems with its subprime loan portfolio in its 2006

15

10-K. Instead, the Company led investors to believe that its subprime loss exposure was minimal by

stating that, from 2004 to 2005 "[n]on-prime [subprime] mortgage originations declined 20%,

reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower

FICO score customers." *Id.*

64.     On April 16, 2007, Citigroup reported net income for the 2007 first quarter of $5.01

billion, or $1.01 per share. In a press release announcing the results, Citigroup stated "U.S.

consumer revenue growth continued to trend positively, up 6%." Prince was quoted as stating:

> We achieved these results while completing our structural expense
> review, which will help us become a leaner, more efficient
> organization and lower our rate of expense growth. As we look
> ahead, our priorities are clear: we will invest to grow and integrate
> our businesses, take actions to improve efficiency and lower costs,
> and continue to build momentum across our franchises.

65.     Citigroup held a conference call with investors on April 16, 2007 to discuss the

Company's financial results for the first quarter of 2007. When questioned by an analyst as to

whether loans held by Citigroup totaling $9 billion were no documentation or low documentation

subprime loans, Citigroup's then CFO Gary Crittenden would not answer the question and implied

that those loans were profitable:

> **Q – Glenn Schorr:** Thanks. It's UBS. On Slide 6, the U.S.
> consumer mortgage trends, in the footnote you noted that it excludes
> 5 billion of first mortgages and almost 4 billion of second mortgages
> where you didn't have FICO and LTV data. Just curious on what
> type of loans that might be, why you don't have the data, and how
> your gut is that that might change the results that you showed on the
> slide?
>
> **A – Gary Crittenden:** We actually just finished preparing this data
> over the course of the last week or so, and we don't have a
> comprehensive view that includes all of the, you know, the full scope
> of the portfolio. The underlying delinquency performance of the
> things that were excluded from the table have very good delinquency

16

performance associated with them, so there was no – if you look at the underlying performance of those mortgages that were excluded from the table with those that were included, there was just no underlying difference in the delinquency performance between the two.

**Q – Glenn Schorr:** Got you. I'd guess it's probably stuff that falls into that Alt-A, no doc, low doc type of a-

**A – Gary Crittenden:** We don't use that nomenclature here and don't think about the business in that way.

**Q – Glenn Schorr:** Okay. But don't you have FICO and LTV scores on the loan?

**A – Gary Crittenden:** Correct.

**Q – Glenn Schorr:** Okay. I'm good. I don't need a follow-up.

**A – Gary Crittenden:** Thanks.

66.    On the April 16, 2007 conference call, Prince told analysts that he was pleased the bank had achieved "positive operating leverage" in the first quarter, with revenue up 12% more than the 10% rise in expenses, in an attempt to please investors who had been pressing for expense control. "[I]t feels good to me to see that progress," Prince said. "We are delivering on our plan." *Id.*

67.    Excluding an $871 million after-tax charge relating to the Company's restructuring plan, the Company's profit was $1.18 per share for the first quarter of 2007, which beat analysts' estimates of $1.10. Citigroup stock reached a high of $53.59 on the news, a 3.9% increase from its closing price of $51.60 on April 13, 2007.

68.    Citigroup's comments about its operations led investors to believe that Citigroup's subprime loan loss exposure was minimal. Paul Nolte, director of investments at Hinsdale

Associates, a money management firm, was quoted as stating: "One of the question marks coming

into earnings season has been the mortgage issue, and Citigroup making positive comments about its

business has lent some strength to the overall market." Rob Kelley and Grace Wong, *Stocks soar on*

*earnings,     deals,*     CNNMoney.com,     April     16,     2007,     *available     at*

http://money.cnn.com/2007/04/16/markets_0545/index.htm.

    69.    On May 4, 2007, Citigroup filed its Form 10-Q for the first quarter ended March 31,

2007 with the SEC in which the Company reported income from continuing operations of $5.01

billion. The Company also reported:

> Customer volume growth was strong, with average loans up 14%, average deposits up 19%, average interest-earning assets up 25%, and client assets under fee-based management up 12% from year-ago levels. U.S. debt, equity and equity-related underwriting increased 21% from year-ago levels. Branch activity included the opening of 99 branches during the quarter (48 internationally and 51 in the U.S.). *U.S. Cards* accounts were up 14% and purchase sales were up 6%.
>
>     ....
>
> Net interest revenue increased 8% from last year as higher deposit and loan balances were offset by pressure on net interest margins. Net interest margin in the first quarter of 2007 was 2.46%, down 39 basis points from the first quarter of 2006....
>
> Operating expenses increased 17% from the first quarter of 2006. Excluding the restructuring charge in 2007 and the 2006 initial adoption of SFAS 123(R), expenses were up 12% from the prior year. The relationship between revenue growth and expense growth, excluding the aforementioned impact of restructuring and SFAS 123(R), improved during the quarter. As our Structural Expense Review takes shape, we expect the pace of year-over-year expense growth (excluding acquisitions) to continue to moderate through 2007.
>
>     ....
>
> Credit costs increased $1.3 billion from a year ago, primarily driven by an increase in net credit losses of $509 million and a net charge of

18

> $597 million to build loan loss reserves. The $597 million net build
> compares to a net reserve release of $154 million in the prior-year
> period. The build was primarily due to increased reserves to reflect: a
> change in estimate of loan losses inherent in the initial tenor portion
> of the Consumer Loan Portfolio; portfolio growth, and increased
> delinquencies in second mortgages, in the *U.S. Consumer Lending*
> mortgage portfolio; and portfolio growth in Markets & Banking,
> which includes higher commitments to leveraged transactions and an
> increase in average loan tenor. The Global Consumer loss rate was
> 1.69%, a 23-basis point increase from the first quarter of 2006.

70.     Before the close of the market on July 20, 2007, Citigroup reported net income for the

second quarter of 2007 of $6.23 billion, or $1.24 per share, both up 18%. In a press release

announcing the results, Prince stated:

> We continued to generate revenue and volume growth in our U.S.
> consumer franchise, while making excellent progress in re-weighting
> Citi towards our other businesses, especially our international
> franchises, where revenues and net income increased over 30%. Our
> capital markets-driven businesses performed extremely well and
> international consumer revenues and volumes grew at a double-digit
> pace.

71.     On a July 20, 2007 conference call with investors discussing its second quarter 2007

results, Citigroup revealed that it had been actively managing its subprime exposure for "some time"

and had reduced its exposure "over the last six months." During the second quarter of 2007,

Citigroup's profits from consumer banking fell 15 percent, to $2.7 billion, as credit costs increased

by $934 million. Citigroup increased its loan loss reserves by $465 million, citing higher

delinquencies in second mortgages in consumer lending. Citigroup also announced that it expects to

see continued deterioration in consumer-credit quality through the year's second half, and Citigroup

probably will make "meaningful additions" to its loss reserves.

72.    After Citigroup reported that it would probably suffer significant losses in the second

half of 2007, its stock declined to a close of $46.97 on July 27, 2007, an 8.1% decline, reducing

approximately $20.8 billion in market value.

73.    On August 3, 2007, Citigroup filed is Form 10-Q for the second quarter ended June

30, 2007 with the SEC.  Citigroup reported:

> Income from continuing operations rose 18% to $6.226 billion and
> was the highest ever recorded by the Company.  Diluted EPS from
> continuing operations was also up 18%.
>
>                                    ....
>
> Customer volume growth was strong, with average loans up 16%,
> average deposits up 20%, and average interest-earning assets up 32%.
> International Cards purchase sales were up 31%, while U.S. Cards
> sales were up 6%.
>
>                                    ....
>
> Credit costs increased $934 million or 59%, primarily driven by an
> increase in net credit losses of $259 million and a net charge of $465
> million to increase loan loss reserves.  The $465 million net charge
> compares to a net reserve release of $210 million in the prior-year
> period.  The build in U.S. Consumer was primarily due to increased
> reserves to reflect: higher delinquencies in second mortgages in U.S.
> Consumer Lending, a change in estimate of loan losses inherent in the
> U.S. Cards portfolio, and portfolio growth.

74.    On October 1, 2007 Citigroup announced that dislocations in the mortgage-backed

securities and credit markets, and deterioration in the consumer credit environment are expected to

have an adverse impact on third quarter financial results.  Citigroup estimated that it would report a

decline in net income in the range of 60% from the prior-year quarter, subject to finalizing third

quarter results.  The Company's stated losses included a $1.4 billion write-off in Citigroup's $57

billion portfolio of highly leveraged loans, a loss of about $1.3 billion in the value of securities

backed by subprime loans, and a loss of $600 million in fixed-income credit trading. Citigroup also announced that consumer credit costs rose $2.6 billion, mostly due to a boost in loan-loss reserves. Citigroup's shares rallied after the October 1, 2007 profit warning, as investors were cheered by Prince's comments that markets were recovering, and Citigroup expected a "return to a normal earnings environment in the fourth quarter."

75.    On October 14, 2007, the media reported that a number of banks, including Citigroup, had discussions with the United States Treasury Department regarding the creation of a super fund to create liquidity for SIVs and conduits that were facing liquidity problems. According to reports, many investors had stopped buying commercial paper sold by these structures because they were concerned that the vehicles were exposed to subprime loans. As a result, the vehicles could not raise proceeds to pay off their debts. Also, the vehicles could not immediately sell their assets without suffering a loss.

76.    The purpose of the proposed super fund was to purchase troubled SIVs' assets and eventually resell them in an effort to prevent discount fire sales. "Some bankers objected to the plan, calling it an escape hatch for Citigroup, which has more SIVs than any other bank." Carrick Mollenkamp, Deborah Solomon & Robin Sidel, *Rescue Readied By Banks Is Bet To Spur Market*, WALL ST. J., Oct. 15, 2007.

77.    On October 15, 2007, Citigroup reported its financial results for the third quarter of 2007 and announced write-offs that were half a billion dollars more than the Company had forecast two weeks earlier. Citigroup's third-quarter results included a $1.35 billion pretax write-down in the value of leveraged loans, $1.56 billion of pretax losses tied to loans and subprime mortgages that

were to be repackaged and sold to investors, $636 million in pretax fixed-income trading losses and $2.98 billion in increased consumer credit costs.

78.    On October 16, 2007, Henry M. Paulson, Jr., U.S. Treasury Secretary, said that the conduct of some mortgage market participants had been "shameful" and called for consideration of a nationwide licensing and monitoring system for mortgage brokers. *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments*, US Fed News, Oct. 16, 2007. Secretary Paulson also warned caution over banks' exposure to off-balance sheet vehicles, such as Citigroup's conduit vehicles. Secretary Paulson stated that "[o]ur bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," and that the U.S. Treasury would "review the accounting rules" for these special purpose entities. *Id.*

79.    In connection with the SIV reports, the media reported that Citigroup "has nearly $160 billion in SIVs and conduits, but its shareholders wouldn't get a clear view of this from reading the bank's balance sheet." David Reilly, *Post-Enron rule changes kept banks' risks in dark --- Investors still found it hard to figure out what was going on*, WALL ST. J., Oct. 17, 2007.

80.    It was also reported by the media that "Citigroup is the largest player in the SIV market with seven funds holding about $80 billion in assets" and that SIV "investors are skeptical" about the SIVs and that "[i]nvestors complained that the SIVs were not as reliable as they had been billed." Carrick Mollenkamp, Deborah Solomon, Robin Sidel and Valerie Bauerlein, *SIVs Fueled Debt Boom, But Now Banks Scramble To Prop Up the Funds*, WALL ST. J., Oct. 18, 2007.

81.    The Company's stock price continued to fall and closed at $42.61 on October 19, 2007 -- a 10.9% decline -- eliminating approximately $25 billion in market value over a five-day period.

82.     Citigroup's shares fell another 6.8% on November 1, 2007 after Credit Suisse and

CIBC World Markets downgraded the Company's stock on news that Citigroup might have to cut its

dividend to boost its capital, amid reports that Citigroup would be required to disclose billions more

in losses. Citigroup shares fell $2.85 to $38.51, their lowest level since May 2003 and their biggest

one-day drop since September 2002.

83.     On November 2, 2007, after the market closed, it was reported that Citigroup's Board

would hold an emergency meeting over the weekend, where Prince would resign.

84.     On November 3, 2007, it was reported that "[t]he SEC [was] reviewing how

Citigroup accounted for certain off-balance-sheet transactions that are at the heart of a

banking-industry rescue plan, according to people familiar with the matter." Robin Sidel, Monica

Langley and Gregory Zuckerman, *Citigroup CEO Plans to Resign As Losses Grow --- Bank's Board

to Meet With Prince on Sunday; SEC Queries Accounting*, WALL ST. J., Nov. 3. 2007. The article

also reported that "[t]he SEC is also taking a broad look at how brokerage firms valued assets tied to

high-risk mortgages and whether they were timely in their disclosure of losses to investors." *Id.*

85.     On November 4, 2007, Citigroup announced that Prince resigned. The Company also

announced "significant declines" in the fair value of approximately $55 billion in U.S. subprime

related direct exposures in its Securities and Banking (S&B) business. The Company estimated that

the reduction in revenues attributable to these declines ranged from approximately $8 billion to $11

billion. That would surpass the approximately $2.2 billion in mortgage-related writedowns and

trading losses that Citigroup reported in its third-quarter earnings the previous month.

86.     After the market opened on November 5, 2007, Citigroup's stock fell to $36.00.

87.     As Citigroup revealed its financial condition, its stock fell from $54.26, on June 19, 2007, to $34.58, at the close of the market on November 15, 2007. This amounts to a 36.3% decline in share price and a loss of approximately $87.9 billion in market value in less than six months.

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

88.     Because of Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided to them in connection therewith.

89.     Because of the access to this information, after the commencement of the Class Period, the Defendants knew or should have known that Citigroup's common stock was an imprudent investment. Upon information and belief, Defendants communicated with employees, including Plan participants and beneficiaries, about Citigroup's financial performance, future financial and business prospects, and the attractiveness of Citigroup stock.

90.     Despite Defendants' knowledge of Citigroup's risky business practices as described above, the Company fostered a positive impression of Citigroup as a Plan investment. Management touted strong Company performance and stock benefits. Employees heard positive news about Citigroup's growth, were led to believe that Citigroup stock was a good investment, and that the Plan was prudently managed.

91.    Citigroup publicly and repeatedly highlighted favorable operating results, artificially favorable revenue growth trends, and other positive financial indicators, which were false and misleading.

92.    As fiduciaries, Defendants had a duty to provide participants with complete and accurate information regarding the Plan's investment options, including the Citigroup Inc. Common Stock Fund. Despite these duties, Defendants failed to provide Plan participants with complete and accurate information regarding Citigroup stock, such that the participants could appreciate the true risks presented by investments in the stock and could make informed decisions regarding investments in the Citigroup Inc. Common Stock Fund.

93.    Employees never received any information from the Company or any other Plan fiduciary that indicated that the Company's stock was not a prudent investment for their funds remaining in the Plan.

94.    Citigroup employees and Plan participants were led to believe that Citigroup stock was a prudent investment and that the Plan was managed properly. These misleading communications regarding the performance and value of Citigroup stock caused Plaintiff and the Class to invest in the Citigroup Inc. Common Stock Fund and to maintain that investment to their detriment.

95.    Defendants knew or should have known about the characteristics and behavior of Plan participants, well-recognized in the 401(k) literature and the trade press, concerning investments in company stock, including that:

      (a)    Out of loyalty, employees tend to invest in company stock;

      (b)    Employees tend not to change their investment option allocations in a plan once made; and

(c) Lower income employees tend to invest more heavily in company stock than more affluent workers.

96.     Even though Defendants knew or should have known these facts, and even though they knew of the high concentration of Plan participant funds invested in the Citigroup Inc. Common Stock Fund, they did nothing to address the risks to Plaintiff and the Class.

97.     Defendants' breaches of fiduciary duties caused Plaintiff and the Class to invest in Citigroup stock and retain their investment in the stock.

98.     Prince had an incentive for the participants of the Plan to invest in Citigroup stock because his compensation was tied to the performance of Citigroup's stock price.

99.     The Administration and Investment Committee members were dominated and/or controlled by Citigroup. These committee members' compensation was controlled by Citigroup.

100.    These conflicts of interest caused Defendants to serve their own interests above the interests of the Plan participants and beneficiaries.

101.    The Plan suffered enormous losses because a substantial amount of the Plan's assets (the Citigroup Inc. Common Stock Fund) were imprudently allowed to be put at great risk by Defendants.

102.    Had Defendants properly discharged their fiduciary duties, the Plan would have avoided the losses that it suffered through its investment in Company common stock.

103.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock. As a consequence of Defendants' breaches, Plaintiffs and the Class and/or the Plan suffered losses.

26

## REMEDIES FOR DEFENDANTS' BREACH OF FIDUCIARY DUTIES

104.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a

civil action for appropriate relief under ERISA § 409, 29 U.S.C. §1109. Section 409 requires "any

person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to

make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other

equitable or remedial relief as the court may deem appropriate . . . ."

105.    Breaches of fiduciary duty result in a presumption that, but for the breaches of

fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained their

investments in the challenged investment and, where alternative investments were available, that the

investments made or maintained in the challenged investment would have instead been made in the

most profitable alternative investment available.  The remedy restores the value of the plan's assets

to what they would have been had the plan been properly administered.

106.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of:

(a) a monetary payment to the Plan to restore the losses resulting from the breaches of fiduciary

duties alleged above, in an amount to be proven at trial based on the principles described above, as

provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable

relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29

U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorneys' fees and expenses, as provided by

ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d)

taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable

relief as may be just and proper.

107.    Each Defendant is personally liable and jointly liable for the acts of the other Defendants as a co-fiduciary.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class consisting of all participants or beneficiaries of the Plan and their beneficiaries during the period after January 1, 2007 (the "Class Period"), for whose accounts the fiduciaries of the Plan made or maintained investments in Citigroup stock (the "Class"). Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director or partner of any Defendant or any entity in which a Defendant has a controlling interest and the heirs, successors or assigns of any of the foregoing.

109.    This action is properly maintainable as a class action because:

(a)    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class.

(b)    Plaintiff's claims are typical of those of the Class because Plaintiff and members of the Class suffered similar harm and damages as a result of Defendants' unlawful and wrongful conduct described herein. Absent a class action, members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

28

(c)     Plaintiff will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class he seeks to represent.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner.

110.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

(a)     Whether ERISA applies to the claims at issue;

(b)     Whether Defendants owe and owed fiduciary duties to the members of the Class;

(c)     The nature of the fiduciary duties Defendants owe or owed to members of the Class;

(d)     Whether Defendants breached their fiduciary duties; and

(e)     The extent of losses sustained by members of the Class and/or the Plan and the appropriate measure of relief.

111.    Plaintiff anticipates no difficulties in the management of this action as a class action.

## ERISA SECTION 404(c) DEFENSE INAPPLICABLE

112.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

113.    ERISA § 404(c) does not apply here. ERISA § 404(c) does not and cannot provide any defense to the Plan's fiduciaries' imprudent decision to select and continue offering Citigroup stock in the Plan, as that decision was not made or controlled by the particpants. *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550).

114.    As to participant directed investments in Citigroup stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing sufficient information to participants regarding Citigroup stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). Participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Citigroup stock as a result of their investment directions, and the Defendants remained responsible for losses that result from such investment.

115.    Because ERISA § 404(c) does not apply here, the Defendants' liability to Plaintiff and the Class and/or the Plan for losses caused by the Plan's investment in Citigroup stock is established

upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

## COUNT I
### For Breach of Fiduciary Duty or Knowing Participation Therein
### (Against All Defendants)

116.    Plaintiff incorporates by reference the allegations above.

117.    The Plan is governed by the provisions of ERISA, 29 U.S.C. § 1001, *et seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan. Each of the Defendants is a fiduciary or co-fiduciary with respect to the Plan pursuant to the provisions of ERISA. As co-fiduciaries, each of the Defendants is liable for the other's conduct.

118.    Defendants violated their fiduciary duties of loyalty and prudence by: (a) failing to adequately investigate and monitor the investments in Company stock; (b) failing to take steps to eliminate or reduce the amount of Company stock in the Plan; and (c) failing to give Plaintiff and the Class accurate information about Citigroup regarding its business practices so they could make informed investment choices under the Plan.

119.    Each Defendant knowingly participated in the fiduciary breaches described herein, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to comply with the provisions of ERISA, and/or had knowledge of the breaches of its co-fiduciaries and failed to take reasonable efforts to remedy such breaches.

120.    As a result of Defendants' breach of fiduciary duties, Plaintiff and the Class and/or the Plan suffered damages, the exact amount of which will be determined at trial.

## COUNT II
### For Violations of ERISA Disclosure Requirements
### (Against All Defendants)

121.    Plaintiff incorporates by reference the allegations above.

122.    Defendants failed to advise Plaintiff and the Class that their investment in Citigroup stock was at substantial risk as a result of the Company's business practices. Defendants also failed to provide Plaintiff and the Class with accurate, truthful, or complete information about the Company's operations and business practices.

123.    Unbeknownst to Plaintiff and the Class, but known to Defendants, Citigroup's undisclosed risk of impaired financial condition was not revealed during the Class Period.

124.    By failing to convey complete and accurate information to Plaintiff and the Class, Defendants violated their affirmative duty to disclose sufficient information necessary to apprise Plaintiff and the Class of the risks associated with investment in Company stock when Defendants knew or should have known that the failure to disclose such material information would result in damages to Plaintiff and the Class and/or the Plan.

125.    As a result of Defendants' failure to disclose and inform, Plaintiff and the Class and/or the Plan suffered damages, the exact amount of which will be determined at trial.

## COUNT III
### For Failure to Monitor Fiduciaries
### (Against Citigroup, Citibank and Prince)

126.    Plaintiff incorporates by reference the allegations above.

127.    Upon information and belief, at all relevant times, the scope of the fiduciary duties of Citigroup, Citibank and Prince included the responsibility to appoint and monitor the performance of the Administration and Investment Committees.

128.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

129.    The monitoring duty further requires that monitoring fiduciaries have procedures in place so that, on an ongoing basis, they may review and evaluate whether investment fiduciaries are doing an adequate job.

130.    A monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have a significant impact on the plan and the fiduciaries' investment decisions regarding the plan.

131.    Citigroup, Citibank and Prince breached their fiduciary monitoring duties by, among other things: (a) failing to monitor their appointees; (b) failing to evaluate their appointees' performance, or to have any system in place for doing so; (c) allowing the Plan to suffer losses as a result of the appointees' imprudent actions; (d) failing to ensure that the monitored fiduciaries appreciated the true extent of Citigroup's risky and inappropriate investments and inflated revenue, and their likely impact on the Plan's investment in Citigroup stock; (e) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed decisions with respect to the Plan's assets; and (f) failing to remove appointees whose performance was inadequate or who breached their fiduciary duties under ERISA.

33

132.    As a result of the failure of Citigroup, Citibank and Prince to monitor fiduciaries, Plaintiff and the Class and/or the Plan suffered damages, the exact amount of which will be determined at trial.

## COUNT IV
### Co-Fiduciary Liability
### (Against All Defendants)

133.    Plaintiff incorporates by reference the allegations above.

134.    As alleged above, during the Class Period the Defendants were either named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

135.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all of the foregoing.

136.    Knowledge of a breach and failure to remedy it pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105 imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts to remedy the breach. Citigroup, Citibank and Prince knew of the breaches by other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activities to the other fiduciaries.

137.    Citigroup, Citibank and Prince knew: (a) that the members of Administration and Investment Committees were breaching their duties by continuing to invest in Company stock; and (b) that the members of the Administration and Investment Committees were breaching their duties by providing incomplete and inaccurate information to Plan participants. Citigroup, Citibank and Prince failed to remedy these breaches.

138.    ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.

139.    Citigroup, Citibank and Prince knowingly participated in the breaches of the members of the Administration and Investment Committees because, as alleged above, they had actual knowledge of the Company's misconduct, ignored their oversight responsibilities and allowed the members of the Administration and Investment Committees to breach their duties.

140.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

141.    Citigroup, Citibank and Prince's failure to monitor the members of the Administration and Investment Committees enabled the members of those committees to breach their duties.

142.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plaintiff and the Class and/or the Plan were damaged in an amount to be proven at trial.

35

143.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### COUNT V
### Knowing Participation in a Breach of Fiduciary Duty
### (Against Citigroup)

144.    Plaintiff incorporates by reference the allegations above.

145.    To the extent that Citigroup is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, Citigroup knowingly participated in the breaches of those Defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable to Plaintiff and the Class and/or the Plan for equitable relief as a result of participating in such breaches.

146.    Citigroup benefitted from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by the Plan, contributing Citigroup stock to the Plan while the value of the stock was inflated as a result of Citigroup's risky and improper business practices, and providing the market with misleading statements and omissions.

147.    By reason of the foregoing, Plaintiff and the Class and/or the Plan are entitled to equitable relief including restitution, disgorgement and/or the imposition of a constructive trust.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class;

(b)     Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

(c)     Granting equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder;

(d)     Allowing a trial by jury to the extent permitted by law;

(f)     Awarding the Plan and/or Plaintiff and members of the Class pre-judgment and post judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

(g)     Awarding such other relief as this Court may deem just and proper.


Dated: New York, New York
       November 16, 2007

                        ZWERLING, SCHACHTER & ZWERLING, LLP


                        By: _____
                              Susan Salvetti (SS 1508)
                              Robert S. Schachter (RS 7243)
                              Justin M. Tarshis (JT 9779)
                              41 Madison Avenue
                              New York, NY 10010
                              Tel: (212) 223-3900
                              Fax: (212) 371-5969

                              *Attorneys for Plaintiff*


37